# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KENNETH CARL GRONDIN III,

Defendant-Appellant.

UNPUBLISHED
June 12, 2018

No. 331809
Lapeer Circuit Court
LC No. 12-010954-FC

Before: O'CONNELL, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree felony murder, MCL 750.316(1)(b), for which he was sentenced to life imprisonment without the possibility of parole. We now reverse defendant's conviction and remand for a new trial.

## I.  FACTUAL BACKGROUND

Defendant, who was 19 years old at the time, began dating the 20-year-old victim, Andrea Eilber, in 2011 after meeting at a Kroger grocery store, where they both worked. They had been dating for several months when the victim was found dead in the basement of her aunt and uncle's home in Mayfield Township, Michigan, during the early morning hours of November 16, 2011. The victim died from a single gunshot wound to the head sometime during the afternoon hours of November 14, 2011.

After the victim's body was found, defendant agreed to submit to an interview with police. Throughout several hours of interrogation, defendant maintained that he did not know anything about the victim's death. Eventually, however, defendant made a written statement that he found the victim's body at around 8:00 p.m. on November 14, 2011, but moved the body and removed items from the home, so that her family would not believe she committed suicide. Defendant also stated that he wore gloves to perform those actions and later burned them. An officer challenged defendant's version of the story, asserting his belief that defendant killed the victim, after which, defendant recanted his story and maintained that he knew nothing of the victim's death. The police arrested defendant and eventually charged him with first-degree felony murder, with larceny as the predicate crime.

## A.  THE INVESTIGATION

-1-

As the investigation continued, the evidence discovered muddied the waters surrounding the events that led to and immediately followed the victim's death. The victim's aunt and uncle, Stephanie and Stewart Hummer, were out of town and told the victim that she could use their house. Defendant, the victim, and Cody Crump, defendant's friend, stayed over at the Hummer residence on November 11, 2011 and November 12, 2011. The victim gave defendant a spare key to the house, which was often hidden on the front porch. Crump claimed that defendant left that spare key on the kitchen counter before leaving the house on November 12, 2011. On November 13, 2011, defendant and the victim spent the night apart from one another, but for around 15 minutes when the victim came to defendant's house to pick up the spare key, according to text messages admitted at trial.

On November 14, 2011, the victim and defendant planned to stay the night alone at the Hummer residence. The victim originally planned to pick up defendant at his house and drive over to the Hummer residence together. The victim changed those plans at around 6:30 p.m., informing defendant that he should just go straight to the house. Defendant told police that he arrived at the Hummer residence at around 7:45 p.m., but found the house dark and the victim not there. Defendant text messaged the victim at around that time, asking her about her location. Defendant claimed that he waited in his car or on the porch until he received a text message at 8:13 p.m. to cancel the plans. Reporting that his cellular telephone died, defendant decided to go back home where he saw his brother and Crump, and asked to use his brother's telephone charger.

Over the course of November 14 and 15, 2011, defendant called the victim's cellular telephone around 75 times, all of which went straight to voicemail. At around 9:00 p.m. on November 14, defendant began a conversation with Brittany Stacy, a fellow friend and coworker at Kroger with whom he shared a growing romantic interest. According to Stacy, she saw defendant at Kroger from around 9:15 p.m. until 9:30 p.m., during which she invited defendant over to her house to watch movies. Defendant had been complaining about the victim cancelling plans with him. Defendant left Kroger at around 9:30 p.m. and made two purchases at a gas station at a Walmart store at 9:42 p.m. Surveillance video showed defendant wearing a red University of Alabama t-shirt and grey sweatpants. Stacy and her roommate reported that defendant arrived at their house at around 10:00 p.m. Defendant's cellular telephone pinged the tower for Stacy's house at 10:16 p.m. Then, at 10:23 p.m., the victim's debit card was used at a Hantz Bank automated teller machine (ATM) in Davison, Michigan. Uncontroverted testimony established that someone could not drive from Stacy's house to Hantz Bank in seven minutes. The person using the victim's debit card could not be identified from the surveillance video. Stacy testified that defendant stayed over, watched a movie, and then left to go home at around midnight.

The following day, November 15, 2011, defendant's cellular telephone pinged the tower for the Hummer residence at 9:58 a.m. Defendant told police that he went to the Hummer residence at around noon. At 11:00 a.m., defendant's cellular telephone pinged the tower for his house. At that same time, the victim's debit card was used at a Speedway gas station in Burton, Michigan. Witnesses were unable to identify the person in the video, nor the dark-colored SUV that parked outside of the restaurant next to the Speedway. Defendant continued a text message conversation with Stacy throughout that day, often expressing sadness regarding the victim. Later that night, the victim's family grew concerned that they had not heard from her. The

victim's other aunt, Carla Ryder, went to the Hummer residence to look for the victim, but found the house dark and apparently uninhabited. The victim's car was not there. Ryder then went to defendant's house to see if he would accompany her to the Hummer residence. Defendant was with Stacy at the time, but came home, and then went to the Hummer residence again. Ryder testified that defendant looked in the garage window with a flashlight, roughly tried to open a sliding glass door that entered into the basement to no avail, and told her that he left a spare key to the house on the kitchen counter a couple of days ago.

The victim's father, Steve Eilber, eventually made a police report. Meanwhile, the victim's friends and coworkers formed a search party for the victim. Defendant refused the invitation to join, citing an early start to work the following day. One coworker of defendant, Jeffrey Babcock, called defendant to see where they should start looking for the victim. Defendant told Babcock that she was at the Hummer residence, but gave Babcock a road name that was around three miles away from the Hummer residence's actual location. Eventually, however, the Babcock search party found the victim's car, abandoned in a state game area parking lot less than two miles away from the Hummer house with the door ajar and a tire mark on the rear bumper.

Later, the police got permission to break into the Hummer residence, where they found the victim's body. She was strangely positioned on a chair in the laundry room of the basement. The medical examiner testified that the victim was bound to the chair, likely with zip ties, when she was shot and killed. Stewart testified that there were a multitude of things missing from his home, but that obviously valuable items were left behind, such as a gold nugget and jewelry.

During a search of defendant's house, the police discovered defendant's red Alabama t-shirt and grey sweatpants in a laundry bin. After collecting the evidence, it was returned to the police station. Two days later, an officer opened the bag with the clothing and discovered that there was a bloody hair inside. The bloody hair matched the victim's DNA. There was no blood transferred to defendant's clothing.

## B. PROCEDURAL HISTORY AND PRIOR APPEAL

Defendant was bound over for trial on a charge of first-degree felony murder, with larceny as the underlying felony. Before trial, defendant moved to suppress his statements made during his interview. Defendant argued that his waiver of rights was not voluntary or knowing, and that the police had purposely failed to inform him that an attorney hired by his mother was trying to reach defendant before that interrogation. Over the course of a three-day *Walker*[1] and *Bender*[2] hearing, evidence was introduced that Officer Mark Reaves knew an attorney was trying to contact him on behalf of defendant, that he purposely hung up on the attorney, and told Officer Ronald Ainslie not to answer his telephone. When the trial court heard that motion, the Michigan Supreme Court's decision in *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996)

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[2] *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996).

(opinion by CAVANAGH, J.), overruled *People v Tanner*, 496 Mich 199; 853 NW2d 653 (2014), was the prevailing law of the land. In *Bender*, 452 Mich at 597, the Court held "that Const 1963, art 1, § 17 requires the police to inform the suspect that a retained attorney is immediately available to consult with him, and failure to so inform him before he confesses per se precludes a knowing and intelligent waiver of his rights to remain silent and to counsel." Relying solely on *Bender*, the trial court suppressed defendant's statement.

The case was stayed while the prosecution sought an interlocutory appeal of that decision. This Court denied the prosecution's application for leave to appeal on October 25, 2012.[3] The prosecution then sought leave to appeal with the Michigan Supreme Court. On May 22, 2013, the Court entered an order holding the appeal in abeyance, noting that *Tanner* was pending before the Court "and the decision in that case may resolve an issue raised in the present application for leave to appeal . . . ." *People v Grondin*, 830 NW2d 136 (2013). Then, on June 23, 2014, the Court issued its decision in *Tanner*, 496 Mich at 203-204, overruling *Bender* because the rule created in that case was not based on the Michigan Constitution. The Court held that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Tanner*, 496 Mich at 256, quoting *Moran v Burbine*, 475 US 412, 422-423; 106 S Ct 1135; 89 L Ed 2d 410 (1986). "[T]he failure of police to inform a suspect of an attorney's efforts to contact him does not invalidate an otherwise 'voluntary, knowing, and intelligent' *Miranda* waiver." *Tanner*, 496 Mich at 249. On September 29, 2014, the Court entered an order stating that the prosecution's "application is again considered and . . . in lieu of granting leave to appeal, we remand this case to the Court of Appeals for consideration as on leave granted." *People v Grondin*, 497 Mich 867; 853 NW2d 372 (2014).

Subsequently, this Court vacated the trial court's order suppressing defendant's statement, and remanded for the trial court to determine whether defendant's statements were voluntary. *Grondin*, unpub op at 7. Given that the trial court relied solely on *Bender*, it had not made any findings of fact regarding other factors that might suggest defendant's statements were not voluntarily, knowingly, and intelligently made. *Id*. Thus, this Court remanded for the trial court to make those findings of fact and determine admissibility while relying on the factors pronounced by the Michigan Supreme Court in *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988). *Grondin*, unpub op at 6-7. This Court did not retain jurisdiction. *Id*. at 7.

The trial court heard oral argument on that issue on July 31, 2015, based on the *Walker* and *Bender* hearing that occurred in 2012. After hearing arguments, the trial court issued a written opinion and order denying defendant's motion to suppress his statement, reasoning that the statement was voluntary based on the totality of the circumstances of the interview.

## C. THE TRIAL

---

[3] *People v Grondin*, unpublished order of the Court of Appeals, entered October 25, 2012 (Docket No. 311295).

Over the course of the 12-day trial, the prosecution relied heavily on defendant's statement, which he admitted being him at the scene of the crime at the time it was committed, and taking several items, which he did not specify, from the household. The defendant's admissions were supported by defendant's cellular telephone pinging off the cellular tower for the Hummer residence on the night in question and by the items actually missing: a bottle of cologne, a men's knit sweater, a GPS unit, a trail cam, an owl's foot, three knives, a .22 caliber hunting rifle, some .22/250 bullets, some 303 British bullets, a bag of foreign coins, and $50 to $80 in cash. Officer Mark Pendergraff testified that a person who kills someone else will answer questions in a certain manner to minimize their involvement or disassociate themselves from the victim. Officer Pendrgraff stated that defendant did those things when he said that the person that killed the victim should get a second chance if it was an accident, called the victim "this girl" instead of using her name, and used the police officers' theme of suicide to minimize his involvement. Officer Brian Reece was concerned about defendant's proposed timeline, because he said he returned to the Hummer residence at around noon on November 15, 2011, to look for the victim, but his cellular telephone pinged the tower for that location at around 10:00 a.m. Officer Reaves also noted that defendant said he moved the victim's car, even though it was not yet clear whether the victim was abducted while driving her car or whether her car was moved from the Hummer residence. Moreover, defendant told Babcock the wrong road to search for the victim, even though he clearly knew the correct road because he was at that spot on the same day. Further, defendant stated that he burned his gloves and socks without knowing that police had found a burn pile found near the victim's car. An expert witness testified that the burn pile contained fabric fibers, which he could not otherwise identify. The expert could not exclude that the fibers could be from a pair of burned gloves.

In addition to defendant's statement, the prosecution relied on the victim's hair and blood being found with defendant's sweatpants in its case-in-chief. Additionally, there was no sign of forced entry into the Hummers' house and defendant had access to a key. Defendant also was the only person that knew of the victim's decision to go straight to the Hummer residence instead of first going to defendant's home. Further, no other witnesses besides family members, defendant, and Crump could find their way to the Hummer residence unassisted. The prosecution also presented evidence of defendant's possible motive, citing text messages between defendant and his mother discussing the lack of funds in defendant's bank account, and that defendant's whereabouts were unknown from around 8:30 p.m. to 9:15 p.m., and from 9:30 p.m. to 10:00 p.m. on November 14, 2011, but for his 9:42 p.m. stop at a gas station. The prosecution attacked Stacy's credibility regarding defendant's whereabouts on the night in question, eliciting testimony that Stacy began dating defendant around $1^1/_2$ years after the murder, so was a biased witness. The medical examiner's testimony that the bindings on the victim's wrists were not removed until six to seven hours after the murder supported the prosecution's theory, given that defendant's cellular telephone records placed him back at the Hummers' house the morning after the murder. The prosecution posited that this was when defendant cut the zip ties binding the victim to the chair. Considering that defendant had access to the house, the prosecution alleged that defendant removed things from the house, moved the victim's car, and disposed of evidence to make it look like the victim was killed in the process of a larceny. Officer Pendergraff testified that this faux-larceny theory was supported by the fact that items of obvious value were left behind at the Hummer residence.

Defendant's theory of the case was that the victim was undoubtedly murdered, but not by defendant. Defendant relied heavily on evidence that he was at Stacy's house watching a movie when the victim's debit card was used to withdraw money from an ATM at Hantz Bank. His cellular telephone records pinged the tower for her house at that time. Additionally, defendant's cellular telephone pinged the tower for his own house at 11:00 a.m., when the victim's debit card was again being used at the Speedway gas station in Burton. No one could identify who was in either video. Officer Pendergraff acknowledged that it appeared as if the person in the Speedway video was wearing a boot with a heel, and that the police did not discover any such footwear when searching defendant's house and car. The defense proposed that the person using the ATM was the murderer.

The defense also elicited testimony regarding forensic evidence that allegedly exculpated defendant. First, there was no automobile fluid on any of defendant's shoes that were seized during the search warrant, while the victim's father, Eilber, said that the driver of the victim's car would have had such fluids on his shoes. That was supported by fluid being found on the floorboard of the driver's seat of the victim's car. Second, unidentified DNA was found in the victim's car on the steering wheel, gear-shifter, and emergency brake handle.[4] Defendant's DNA was found near the passenger seat, but the defense indicated that he would sit there often while the victim drove. Third, defendant's DNA did not positively appear under the victim's fingernails, but rather, the victim's own DNA and the DNA of an unknown person appeared under one fingernail. Fourth, an unidentified person's DNA was removed from the back of the chair in which the victim was found. Fifth, unidentified fingerprints were found on one of two glasses that were in the sink of the kitchen, on the sliding glass door to the basement of the Hummer residence, and in the victim's car. Defendant was excluded as a possible match for all of those fingerprints.[5] Sixth, there was a note with an unidentified person's DNA on it underneath a spare key and coupon on the kitchen counter of the Hummers' house. The note had defendant's name and cellular telephone number on it. Seventh, a forensic firearm expert testified that the bullet that killed the victim did not come from a gun that was found in defendant's house. Finally, a cigarette butt found in the driveway of the Hummer residence that was taken as evidence contained the DNA of an unknown male.

---

[4] Officer Pendergraff testified that DNA samples were taken from at least 33 people related to the case, and that samples of sufficient quality from the crime scene were compared to the millions of DNA profiles stored in the Combined DNA Index System (CODIS), a national database maintained by the Federal Bureau of Investigation (FBI). At the time of trial, the unknown DNA samples were still checked against CODIS on a weekly basis. Officer Reece testified that if a match was found, the matching person would be investigated.

[5] Like the unknown DNA, the unknown fingerprints of sufficient quality were compared to the fingerprints of the people involved in the case—52 separate individuals. Two fingerprints, one found on a drinking glass at the Hummer residence and one on the passenger side window of the victim's car, were entered into the Automated Fingerprint Identification System (AFIS), a national database awaiting a possible future match.

The defense suggested that the hair and blood found with defendant's sweatpants was the result of poor police evidence preservation. The defense elicited testimony that Officer Reece was in the laundry room with the victim's body on the night of the crime before going to defendant's house to exercise the search warrant. While there, Officer Reece placed the clothing in a single evidence bag but did not seal it. The defense posited that the hair likely came from Officer Reece when he was at the crime scene, or from some other evidence that travelled through the police station, considering that Officer Reece did not seal the evidence bag. Valerie Bowman, an expert witness, testified that it was not uncommon, especially in fall and winter months, for hair to stick to clothing via static electricity. A bloody hair also could stick to the bottom of a shoe. Bowman clarified that she thought it more likely that the hair came from defendant's sweatpants. Bowman also stated that there was no blood on defendant's sweatpants, so the blood on the victim's hair must have been entirely dry when it came in contact with the pants. The victim's blood was not found on any piece of defendant's clothing.

The defense also theorized that the police failed to investigate other potential suspects. The police acknowledged that a neighbor of the Hummers provided information that a blue car with a red quarter-panel and loud exhaust was seen at the Hummers' house at 7:30 p.m. on November 15, 2011. The police never found the alleged driver of the car or the car itself. Initially, the defense contended that the police should have focused on Babcock as a suspect. Defendant questioned how Babcock was able to find the hidden car when he was allegedly given improper directions by defendant, noted that Babcock's black Jeep SUV could have been the vehicle in the Speedway video, and that Babcock called defendant on the night of November 15, 2011, even though defendant did not have Babcock's number. The defense pondered whether the note on the kitchen counter under the spare key belonged to Babcock, as defendant's name and telephone number were on it, and no one else in the house had reason to write down defendant's telephone number. The police never searched Babcock's Jeep or house. On cross-examination, Babcock acknowledged that, after several years of working for Kroger, he quit just a few weeks after the victim's murder, that he was a hunter, and that he owned several guns.

Additionally, testimony revealed that the victim had recently defriended Michael Garibay on Facebook before her death. Kayla Burrows, a mutual friend of the two, testified that the victim had removed Garibay from her Facebook because she was annoyed with his posts. Shortly after the murder, Garibay posted a photograph of himself wearing a sweatshirt that looked like one stolen from the Hummer residence and holding a gun that possibly could have been a .38 caliber handgun, the type used to kill the victim. Officer Pendergraff testified that the police searched Garibay's cellular telephone and that they compared Garibay's DNA and fingerprints to the known samples, but that there was not a match. The police only could trace his telephone records back until November 19, 2011. Garibay stated that he did not have a cellular telephone before that day. Burrows testified that she had not seen or heard from Garibay in several years at the time of the murder, and Officer Reece stated that there was no evidence of any contact between the victim and Garibay in the victim's cellular records since November 1, 2011. Garibay's house and car were not searched.

Several witnesses recalled seeing saw a man looking at the victim's wrist in what they thought was a suspicious manner at the victim's funeral. The man was later identified as Raymond Fuller. One witness told Officer Reaves that Fuller moved out of state shortly after the murder. The police cleared Fuller as a suspect. Officer Pendergraff testified that Fuller's

-7-

cellular telephone pinged the tower for the Speedway in Burton on November 15, 2011, but clarified that Fuller lived two miles away from that Speedway. Fuller voluntarily provided his DNA and fingerprints, which did not have any connection to the scene. Further, Fuller's cellular telephone did not ping the area of the Hummers' residence on the days in question. The police did not search Fuller's house or car.

The defense next questioned the police investigation into David Fletcher. Fletcher's father, who had experience in law enforcement, saw the Speedway video and called police to inform them that he believed the man in the video to be his son. The police contacted Fletcher's aunt, who agreed that the man in the video was Fletcher. During the investigation, police discovered that on December 22, 2011, Fletcher had parked a vehicle he had stolen from his aunt at the restaurant next to the Speedway, walked to the Speedway, and then committed a carjacking. The defense noted the similarity between those actions and the path used by the person using the victim's debit card at the Speedway on November 15, 2011. Officer Reaves testified that he searched Fletcher's cellular telephone, but not his house or car. Officer Ainslie testified that Fletcher's cellular telephone did not ping off a tower anywhere near the Hummers' house on November 14, 2011 or November 15, 2011. In addition to that, Officer Pendergraff said Fletcher was cleared as a suspect when his fingerprints and DNA did not match those at the scene, and the police discovered that Fletcher committed the carjacking in the midst of a "drug binge" and used an Airsoft gun, not a .38 caliber handgun.

Lastly, the defense asserted that Frederick Aaron Adams, the victim's half-brother, also should have been investigated more thoroughly. The defense elicited testimony that Adams suffered with drug addiction and depression. Shortly after the victim's murder, Adams died from a drug overdose, which police suspected was a suicide. Officer Pendergraff testified that the suicide was likely due to depression, noting that Adams's mother, sister, and father died within four to five years of one another. Officer Pendergraff also acknowledged, however, that he was contacted by Jedidiah Smith, Adams's close friend, on November 19, 2014. Smith told police that Adams stated that he introduced defendant to a drug dealer in Flint before the victim's death. According to Smith, Adams and defendant both owed that drug dealer money at the time of the victim's death, and that someone had provided the drug dealer with information that the victim had money. Adams told Smith that he felt guilty over the victim's death and that he believed the drug dealer was involved in her murder. Smith provided Officer Pendergraff with a description of the drug dealer and the location where he normally sold drugs. Officer Pendergraff testified that he was not provided with enough information for further investigation. Adams's fingerprints and DNA were not connected to the crime scene.

Officers Ainslie, Reaves, Reece, and Pendergraff testified that they investigated all of the other potential suspects and that they concluded only defendant could be legitimately connected to the crime. Randy Khan, an expert in cellular telephone data and analysis, testified that it was common for criminals to use their cellular telephones to exculpate themselves from crimes. The prosecution contended that defendant either gave his cellular telephone to someone else so that calls would ping towers that were not near the ATMs he used to withdraw the victim's money or, that defendant gave the victim's debit card to someone else before going to Stacy's to watch movies. Officer Reaves and Officer Pendergraff could not say that the person in the Speedway or Hantz Bank videos was defendant, but they also were not able to rule him out. Officer

Pendergraff also testified that there were no errors in the collection of evidence under Michigan State Police policy.

The police obtained search warrants for the homes and cellular records of defendant's friends, including Stacy. Testimony revealed that the police were searching for the items missing from the Hummer residence, the victim's items, and the murder weapon. The police believed that defendant may have given some of those things to his friends. The cellular telephone records and home searches provided no evidence that defendant used his friends to distribute the stolen items or the gun. Officer James Shaw also searched various pawn shops throughout Genesee County, but did not find any of the missing items or the gun. The police also drained the pond behind the Hummers' house, which contained no evidence. At the time of trial, the gun used to kill the victim, the victim's cellular telephone and car keys, and the items missing from the Hummer residence were not found.

The jury deliberated for two days before finding defendant guilty of first-degree felony murder. Defendant was sentenced to life imprisonment without parole.

Defendant filed several motions for postjudgment relief, arguing that he was entitled to a new trial or a judgment of not guilty notwithstanding the verdict, due to prosecutorial misconduct, improper statements by police witnesses, ineffective assistance of counsel, because the verdict was against the great weight of the evidence. Defendant also moved the trial court to set aside his sentence, asserting life imprisonment without the possibility of parole was an unconstitutional sentence for defendant. The trial court denied the motion to set aside the sentence, but in lieu of granting or denying the other motions, the trial court entered an order scheduling a *Ginther*[6] hearing. After holding that hearing, the trial court issued a written opinion and order denying defendant's motions for a new trial or an entry of judgment notwithstanding the jury's verdict. This appeal followed.

## II. DEFENDANT'S STATEMENT TO POLICE

Defendant argues that the trial court erred in admitting the video of his interrogation and written statement to police.

### A. APPLICATION OF *TANNER*

Defendant contends that applying *Tanner* in the instant case, rather than *Bender*, resulted in violations of principles of due process and the Ex Post Facto Clauses of both the Michigan and United States Constitutions. We disagree.[7]

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[7] The prosecution argues that this question was foreclosed by this Court's prior opinion in *Grondin*, unpub op at 5-7, and the law-of-the-case doctrine. Because we did not specifically consider this question in that appeal, we disagree that the doctrine applies and will consider the issue now. See *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612 NW2d 120 (2000).

1. STANDARD OF REVIEW AND APPLICABLE LAW

"The determination whether a charge is precluded by the constitutional prohibition against ex post facto laws presents a question of law, which is reviewed de novo on appeal." *In re Contempt of Henry*, 282 Mich App 656, 681; 765 NW2d 44 (2009). "We also review de novo the issue whether a defendant was denied his right to due process." *People v Smith*, 319 Mich App 1, 5; 900 NW2d 108 (2017).

"Article I, § 10, of the [United States] Constitution prohibits the States from passing any 'ex post facto Law.' " *Cal Dep't of Corrections v Morales*, 514 US 499, 504; 115 S Ct 1597; 131 L Ed 2d 588 (1995). "The language contained in the Michigan Constitution's Ex Post Facto Clause, Const 1963, art 1, § 10, is nearly identical to the language contained in the federal constitution, US Const, art I, § 10." *People v Earl*, 495 Mich 33, 37 n 1; 845 NW2d 721 (2014). Consequently, "Michigan's Ex Post Facto Clause is not interpreted more expansively than its federal counterpart." *In re Contempt of Henry*, 282 Mich App at 682. "The Ex Post Facto Clauses of the United States and Michigan Constitutions bar the retroactive application of a law" in four separate situations: the law "(1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence." *Earl*, 495 Mich at 37. However, "[t]he *Ex Post Facto* Clause pertains exclusively to penal statutes." *Kansas v Hendricks*, 521 US 346, 348; 117 S Ct 2072; 138 L Ed 2d 501 (1997). Specifically, "[t]he Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government." *Marks v United States*, 430 US 188, 191; 97 S Ct 990; 51 L Ed 2d 260 (1977) (internal citation omitted).

As discussed, the Ex Post Facto Clause applies only to legislative actions, "[b]ut the principle on which the Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty." *Marks*, 430 US at 191. "As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment." *Id.* at 192. "Although the general rule is that judicial decisions are given full retroactive effect, a more flexible approach is warranted where injustice might result from full retroactivity." *Pohutski v City of Allen Park*, 465 Mich 675, 695-696; 641 NW2d 219 (2002) (internal citation omitted). The Michigan and United States Supreme Courts have provided three factors to be considered when determining whether "a decision should have retroactive application . . . : (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." *Id.* at 696, citing *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965). "The second and third factors can be dealt with together, because the amount of past reliance will often have a profound effect upon the administration of justice." *People v Hampton*, 384 Mich 669, 677; 187 NW2d 404 (1971).

2. ANALYSIS

Defendant argues that applying the *Tanner* rule to his case instead of the *Bender* rule amounts to a violation of the Ex Post Facto Clauses of both constitutions. Those clauses, however, are simply not implicated by application of *Tanner* to this case. The decision in *Tanner* certainly was not a change to a "penal statute" or an act of the Legislature. *Hendricks*,

521 US at 348; *Marks*, 430 US at 191. Further, the *Tanner* Court's ruling—that the police's failure to alert defendant that he had an attorney retained and available to speak to him did not affect whether defendant made a knowing, intelligent, and voluntary waiver—does not "punish[] an act that was innocent when" defendant made his statement, "make[] an act a more serious criminal offense[,] increase[] the punishment for a crime[, or] allow[] the prosecution to convict on less evidence." *Earl*, 495 Mich at 37. Instead, first-degree felony murder was illegal, punishable by life imprisonment without the possibility of parole, and required to be proven beyond a reasonable doubt both before and after the *Tanner* decision. MCL 750.316(1)(b). Thus, defendant's contention that application of *Tanner* violated the Ex Post Facto Clauses of the Michigan and United States Constitutions is without merit. *Hendricks*, 521 US at 348; *Earl*, 495 Mich at 37.

Defendant also argues that application of the *Tanner* decision to his case violates principles of due process. His argument is without merit. In deciding *Tanner*, 496 Mich at 252 (internal quotation marks omitted), our Supreme Court held that "overruling *Bender* would not produce practical real-world dislocations, primarily because *Bender* obviously cannot be said to have caused suspects to alter their conduct in any way." The Court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id*., quoting *Moran*, 475 US at 422 (alteration in *Tanner*). Stated differently, when defendant chose to waive his *Miranda* rights and provide a statement to police, his decision was not in reliance on his understanding of the law under *Bender*. Notably, in order for defendant to have detrimentally relied on that decision, he would have had to have been aware that he was making his statement while the police were refusing to inform him that there was a retained attorney available. The paradox is clear. Defendant cannot truthfully argue both that he made his statement in reliance on *Bender* and that *Bender* should apply to his case. The two are mutually exclusive. Consequently, there is no reason for this Court to forego "the general rule [] that judicial decisions are given full retroactive effect . . . ." *Pohutski*, 465 Mich at 695-696.

## B. VOLUNTARINESS

Defendant argues that the trial court improperly held that defendant's statement was voluntarily made and thus, admissible. We disagree.

### 1. STANDARD OF REVIEW AND APPLICABLE LAW

"This court 'review[s] a trial court's factual findings in a ruling on a motion to suppress for clear error.' " *Tanner*, 496 Mich at 206, quoting *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). "We review de novo a trial court's determination that a waiver was knowing, intelligent, and voluntary." *People v Henry (After Remand)*, 305 Mich App 127, 144; 854 NW2d 114 (2014) (internal quotation marks omitted). A trial court's factual determinations are "clearly erroneous only if we are left with a definite and firm conviction that the trial court made a mistake." *People v Dickinson*, 321 Mich App 1, 21; 909 NW2d 24 (2017).

"The Fifth Amendment of the United States Constitution provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' " *Tanner*, 496 Mich at 206-207, quoting US Const, Am V (alteration in *Tanner*). The Michigan Constitution contains

an identical clause. Const 1963, art 1, § 17. "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010), citing *Miranda*, 384 US at 444. "In evaluating the admissibility of a particular statement, we review the totality of the circumstances surrounding the making of the statement to determine whether it was freely and voluntarily made in light of the factors set forth by our Supreme Court . . . ." *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000) (internal quotation marks and citations omitted). The Michigan Supreme Court provided a non-exhaustive list of factors to consider in *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988):

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

The Court clarified that "[t]he absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness," but that "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*.

## 2. ANALYSIS

The trial court held a *Walker* hearing over the course of three days, during which it accepted testimony from a multitude of officers and witnesses. After reviewing that testimony and the portion of defendant's interrogation that was recorded, the trial court issued a written opinion denying defendant's motion to suppress the statement. Therein, the trial court made the following findings of fact and determinations of law:

> Defendant was approximately 19-years-old at the time [of the interrogation]. He could read and write English, had completed high school, and was taking college courses. Prior to questioning and as a precautionary measure, Defendant was twice advised of his *Miranda* rights. Defendant was also informed on no fewer than three (3) occasions that he was not under arrest and that he could terminate the questioning and leave at any time if he so desired. Defendant never indicated that he had difficulty understanding his rights. Rather, he verbally acknowledged that he understood his rights, and more importantly, reviewed and then signed a written notification of constitutional rights before making the statements at issue. There is no indication whatsoever that Defendant was injured, in poor health, under the influence of alcohol or drugs, or in need of medical attention. There is

also no evidence that Defendant was physically abused or threatened with abuse. Moreover, Defendant was not deprived of food. To the contrary, he was generously provided a sandwich and drink of his choosing from McDonalds. Finally, although Defendant was questioned on three (3) separate occasions starting early in the morning and ending that afternoon, no single round of questioning exceeded two (2) hours and ten (10) minutes in duration, Defendant was afforded several breaks, and the questioning process, in total, lasted approximately six (6) hours. This was not an unduly prolonged interrogation.

This Court acknowledges that sleep deprivation can be a contributing factor in finding that a statement is involuntary, *Cipriano*, *supra* at 334, and that Defendant, by all indications, had less than an ideal amount of sleep, if any at all, prior to being questioned by the police, which may suggest a compromised state. That fact, however, is not dispositive on the issue of voluntariness. Defendant, despite his admitted lack of sleep, was more than willing to submit to questioning by the police. Therefore, to the extent that he arrived at the interview in a sleep-deprived state was of his own doing. In other words, Defendant was not denied rest by his interrogators as a tactic of extracting a confession. More importantly, a careful review of the video evidence confirms that Defendant appeared alert and attentive, and was able to focus on and answer the questions posed to him in an intelligent and articulate fashion. Therefore, Defendant's lack of sleep was not such that it affected his ability to freely and voluntarily waive his *Miranda* rights.

This Court additionally recognizes that this instance was the first contact that Defendant ever had with the police. As this Court previously opined in pertinent part, he was a "neophyte when it came to dealing with law enforcement." However, as noted above, prior police contact is only one of at least eleven factors to be considered in determining whether a defendant's *Miranda* waiver and subsequent statement is voluntary, and no single factor is dispositive. *Sexton*, 461 Mich at 753. Consequently, the fact that Defendant had no prior experience with the police does not, by itself, cause his statement to be involuntary.

The fact that the police were untruthful to a defendant can influence whether a defendant's statement is voluntary, but will not necessarily render an otherwise voluntary statement involuntary. *People v Hicks*, 185 Mich App 107, 113[; 460 NW2d 569] (1990). The police may use psychological tactics in conducting the interrogation of a suspect. *Haynes v Washington*, 373 US 503, 514-515[; 83 S Ct 1336; 10 L Ed 2d 513] (1963). Here, the video and audio evidence reveals that [Officer] Dwyre and [Officer] Reaves may have lied to Defendant about the results of his polygraph examination and that the investigation revealed physical evidence linking him to [the victim's] murder. The officers, furthermore, suggested that Defendant was not a "bad person" and that he may have had lesser culpability—i.e., that he accidentally, rather than intentionally, caused [the victim's] death. These tactics, although questioned and criticized by many legal scholars, are commonly used by law enforcement and are often necessary to elicit a confession. Moreover, as far as this Court is concerned,

the use of such interrogation techniques by Dwyre and Reaves in this case was not so severe, deceptive or psychologically coercive that it undermined Defendant's free will.

Finally, it cannot be stressed enough that Defendant submitted to questioning by the police voluntarily and at his own initiative. He was advised on several occasions that he had the right to remain silent and the right to terminate the interview if he so desired as he was not under arrest. Defendant acknowledged that he had those rights, yet never chose to remain silent and never expressed a desire to cease questioning prior to making statements. When Defendant finally invoked his right to remain silent, the police honored his request.

On the basis of the record, none of the *Cipriano* factors relied on by the Defendant are sufficient, individually or in conjunction, to demonstrate that his will was so overcome that he was incapable of making a voluntary statement. To the contrary, those factors heavily favor the prosecutor's position that Defendant's waiver of his *Miranda* rights and subsequent statements were voluntary under the totality of the circumstances. Defendant's statements, therefore, are admissible at trial.

After reviewing the transcripts of the three-day *Walker* hearing and watching the video interrogation of defendant, we hold that the trial court did not clearly err in making its findings of fact. *Tanner*, 496 Mich at 206. To wit, because the record abundantly supports the trial court's findings, there is no ground for us to be "left with a definite and firm conviction that the trial court made a mistake." *Dickinson*, 321 Mich App at 21. To the extent defendant requests that this Court disagree with the trial court's determination regarding defendant's level of sleep deprivation and his disposition during the interrogation, we refuse to do so because "[d]eference is given to a trial court's assessment of the weight of the evidence and the credibility of the witnesses." *Gipson*, 287 Mich App at 264.

The next step is to determine whether, based on the facts as found by the trial court, "the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano*, 431 Mich at 334. As discussed by the trial court, defendant's age, education, apparent intelligence level, the abundant advice given to defendant on his constitutional rights to remain silent or request counsel, and his repeated verbal and written assurances that he wanted to waive those rights and continue with the interview weigh heavily in favor of finding the statement voluntary. See *id*. Further, the evidence that defendant was not injured, intoxicated, ill, physically abused, or threatened with physical abuse, and was not deprived of food or medical attention also weighs heavily in favor of voluntariness. See *id*.

The trial court noted that defendant undoubtedly lacked sufficient sleep, but properly observed that the lack of sleep was not due to purposeful deprivation by the interrogating officers. Rather, defendant repeatedly chose to submit to interviews, even in light of his lack of sleep. Moreover, the trial court astutely surmised that defendant appeared to be awake and alert during the interrogation, so there is no reason to suggest that defendant's admitted lack of sleep affected the voluntariness of his statement. This factor cannot outweigh the multitude of factors

that show defendant's statement was voluntarily made. See *id*. Nor is defendant's lack of sleep convincing when considering that factor in combination with his lack of experience with police and the interrogation tactics where the police lied about possible evidence. Given defendant's age, education, and intelligence, we agree with the trial court in holding that defendant was not unduly coerced as a result of his lack of experience with police or the interrogation tactics. See *id*.

The record is clear, given the totality of the circumstances of the interview, that the trial court did not err in holding that defendant's statement was voluntary and admissible. See *id*.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence that he committed the predicate crime of larceny to sustain his conviction of first-degree felony murder. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016), quoting *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013), quoting *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). To the extent that this appeal requires statutory interpretation, we review that issue de novo. *People v Ambrose*, 317 Mich App 556, 560; 895 NW2d 198 (2016).

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735. "The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Defendant was convicted of first-degree felony murder pursuant to MCL 750.316(1)(b), which states that a person is guilty of first-degree murder in the following situation:

> Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering

of a dwelling, home invasion in the first or second degree, *larceny of any kind*, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n, torture under section 85, aggravated stalking under section 411i, or unlawful imprisonment under section 349b. [MCL 750.316(1)(b) (emphasis added).]

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Bass*, 317 Mich App 241, 267; 893 NW2d 140 (2016), quoting *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The statute includes "larceny of any kind" as one of the predicate crimes. MCL 750.316(1)(b).

## B. ANALYSIS

Defendant contends that the prosecution only provided sufficient evidence to prove that defendant committed misdemeanor larceny pursuant to MCL 750.356(4)(a), because the value of the items taken was less than $1,000. In Michigan, larceny statutes are to be interpreted "in light of their common-law heritage." *People v March*, 499 Mich 389, 400; 886 NW2d 396 (2016). Consequently, the Michigan Supreme Court has defined larceny as "the felonious taking, and carrying away, of the personal goods of another," and as "the unlawful taking of the personal property of another with the felonious intent to deprive the owner of it." *Id.* at 401 (internal quotation marks omitted). The statutory scheme provides differing punishment based on the value of the goods taken, with items valued at $1,000 or more being a felony, MCL 750.356(2)(a) and (3)(a), and those valued under $1,000 being a misdemeanor, MCL 750.356(4)(a).

Defendant asserts that a misdemeanor felony cannot satisfy the predicate crime element of first-degree *felony* murder. The prosecution contends that the term "felony murder" is a misnomer and that the statute regulating the crime never uses the word "felony" but merely provides a list of predicate offenses, which includes "larceny of any kind" that necessarily includes a misdemeanor larceny. This Court previously has considered this argument on several different occasions, always reaching the same result: "As indicated, the plain language of the statute is larceny of any kind, which words do not appear to lend themselves to ambiguity or tortured interpretation. Defendant's claim is without merit. The words 'larceny of any kind' include both larcenies that are felonies and larcenies that are misdemeanors." *People v Hawkins*, 114 Mich App 714, 717; 319 NW2d 644 (1982); See also *People v Oliver*, 111 Mich App 734, 741; 314 NW2d 740 (1981), overruled on other grounds by *People v Williams*, 422 Mich 381, 387; 373 NW2d 567 (1985); see also *People v Williams*, 129 Mich App 362, 368; 341 NW2d 143 (1983), rev'd on other grounds 422 Mich 381 (1985).

Defendant contends that this court should ignore that case law due to its age, MCR 7.215(J)(1). We refuse the invitation for two reasons. First, the plain language of the statute, which this Court is required to consider and enforce as written, never mentions the word "felony" to describe any crime listed therein. MCL 750.316(1)(b); *People v Baham (On Remand)*, 321 Mich App 228, 237; 909 NW2d 836 (2017). Felony murder is merely a term of

convenience used by the courts when discussing that particular subsection of the first-degree murder statute. MCL 750.316. Thus, defendant has provided this Court with no substantive reason to disagree with the well-reasoned decisions of previous panels, but instead would have us decide the case contrary to the plain language of the statute. MCL 750.316(1)(b). Second, this Court has indicated its intent to abide by those previous decisions, although in dicta, in a decision that would otherwise be binding pursuant to MCR 7.215(J)(1). To wit, in *People v Malach*, 202 Mich App 266, 269; 507 NW2d 834 (1993), while discussing whether the crime of false pretenses counts as a "larceny of any kind" pursuant to MCL 750.316(1)(b), this Court noted that "[e]ven a misdemeanor larceny has been found sufficient for purposes of [the] statute." We now hold similarly.

Therefore, considering defendant's statement that he removed items from the Hummer residence, Stewart's testimony that several items of value were actually missing from his home when he returned, and evidence that those items were never found or returned to the Hummers, is sufficient to prove beyond a reasonable doubt that defendant committed "the felonious taking, and carrying away, of the personal goods of another," or "the unlawful taking of the personal property of another with the felonious intent to deprive the owner of it." *March*, 499 Mich at 401 (internal quotation marks omitted). Because "larceny of any kind" includes a misdemeanor larceny, the value of those goods ultimately was irrelevant. MCL 750.316(1)(b); *Hawkins*, 114 Mich App at 717. In sum, there was sufficient evidence that defendant committed misdemeanor larceny, which was sufficient as a predicate crime to convict defendant of first-degree felony murder. MCL 750.316(1)(b).

## IV. THE JURY VERDICT FORM

Defendant argues that the jury verdict form was constitutionally deficient, effectively denied his right to a trial by jury, and requires a reversal of his conviction. We agree.

### A. WAIVER

We must first address the prosecution's assertion that this issue has been waived. "[I]ssues for appeal must be preserved in the record by notation of objection . . . ." *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). A failure to properly object to an issue forfeits that issue, but does not extinguish the error; instead, it allows for plain error review. *Id.* at 215-216. See also *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Waiver, however, occurs when a defendant "affirmatively approve[s]" of an issue before the trial court, only to later argue that there was error on appeal. *People v Jackson*, 313 Mich App 409, 420; 884 NW2d 297 (2015). When waiver occurs, unlike forfeiture, the error is extinguished. *Carter*, 462 Mich at 215.

Here, after the trial court presented the jury with the verdict form and instructed thereon, the jury was excused, and the trial court asked the parties if there was "[a]ny comment on the Court's instructions and/or verdict form . . . ?" Defense counsel responded, "No, your Honor. We're satisfied." Typically, because defense counsel "affirmatively approved" the jury verdict form and the trial court's explanation, this issue would be considered waived and the error extinguished. *Carter*, 462 Mich at 215-216; *Jackson*, 313 Mich App at 420. However, because the faulty jury verdict form used in this case effectively denied defendant his right to a trial by

jury, as discussed in depth, *infra*, defense counsel could not waive the error without "the fully informed and publicly acknowledged consent of" defendant. *People v Oros*, 320 Mich App 146, 160-162; 904 NW2d 209 (2017), quoting *Taylor v Illinois*, 484 US 400, 417; 108 S Ct 646; 98 L Ed 2d 798 (1988). "Among the basic constitutional rights that cannot be waived absent a defendant's express consent are the rights to plead not guilty, *to have a jury trial*, and to be present at that trial." *Oros*, 320 Mich App at 161(emphasis added), citing *Taylor*, 484 US at 418 n 24. Thus, we will treat the issue as unpreserved, because defendant did not object to any error now alleged on appeal. *Carter*, 462 Mich at 214.

## B. STANDARD OF REVIEW AND APPLICABLE LAW

Typically, "[c]laims of instructional error are reviewed de novo." *People v Wade*, 283 Mich App 462, 464; 771 NW2d 447 (2009). However, because the issue presented has not been preserved for review, we review "for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* As such, "[r]eversal is only warranted if defendant was actually innocent and the plain error caused defendant to be convicted or 'if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings," ' regardless of defendant's innocence." *Roscoe*, 303 Mich App at 648, quoting *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004), quoting *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

An issue with a jury verdict form is considered an error in jury instructions. See *People v Garcia*, 448 Mich 442, 483-484; 531 NW2d 683 (1995). "We review jury instructions in their entirety to determine if error requiring reversal occurred." *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001). In so doing, "[t]he instructions must not be extracted piecemeal to establish error." *Id*. (quotation marks omitted). "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Hawthorne*, 474 Mich 174, 182; 713 NW2d 724 (2006) (quotation marks omitted). "Further, a criminal defendant is deprived of his constitutional right to a jury trial when the jury is not given the opportunity to return a general verdict of not guilty." *Wade*, 283 Mich App at 467. "Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Aldrich*, 246 Mich App at 124.

## C. ANALYSIS

Defendant argues that the jury verdict form was faulty, because it did not allow for a general verdict of not guilty or include a "not guilty" option for the lesser-included offense of second-degree murder. Defendant contends that the form was similar to the form in *Wade*, 283 Mich App at 465, which this Court held to be constitutionally deficient and to require a new trial.

STATE OF MICHIGAN
IN THE CIRCUIT FOR THE COUNTY OF LAPEER

PEOPLE OF THE STATE
OF MICHIGAN                             Case No. 12-010954-FC

            Plaintiff                   HON. NICK O. HOLOWKA

V

KENNETH CARL GRONDIN III,

            Defendant

_____

POSSIBLE VERDICTS:

You may return only one verdict on this charge. Mark only one box on this sheet

We, the jury, find as follows:

Count One:

_____ Not Guilty

___X___ Guilty of First Degree Felony Murder

Or:

_____ Guilty of Second Degree Murder

Before sending the jury to deliberate, the trial court provided the following instructions on the jury verdict form:

We have possible verdicts: Count 1, known as felony first degree murder: Not guilty, guilty of first degree felony murder. If you're able to make a decision, make a decision. If you're not able to make a decision, you can consider, as I read to you in the instructions, what is known as second degree murder. If you check that box, that would be a guilty. There's not a not guilty on that. So again, it does indicate clearly that if you're able to reach a verdict, you only put one check mark on where there are three spots.

-19-

Defendant asserts that the jury verdict form in this case is substantially similar to the form used in *Wade*, so this Court is bound to follow the precedent set in that case. The defendant in *Wade* was charged with first-degree premeditated murder for shooting and killing someone. *Wade*, 283 Mich App at 463-464, but was convicted of involuntary manslaughter. The defendant contended that the shooting was unintentional, and that he meant the shot to simply be a "warning shot." *Id*. at 464. Considering those defenses, the trial court instructed the jury regarding the lesser-included offenses of second-degree murder and involuntary manslaughter. *Id*. at 465. The jury in *Wade*, 283 Mich App at 465, was provided with the following jury verdict form:

Similar to the instant case, the trial court in *Wade*, 283 Mich App at 465-466 (alterations in original), also instructed the jurors on the form before they began to deliberate:

> You understand keenly in the verdict form, as to Count 1, the defendant, Mr. Wade, is charged with . . . Homicide, Murder in the First Degree, Premeditated.

POSSIBLE VERDICTS

YOU MAY RETURN ONLY ONE VERDICT FOR EACH COUNT.

COUNT 1 — HOMICIDE — MURDER FIRST DEGREE
— PREMEDITATED (EDWARD BROWDER, JR)
___NOT GUILTY
___GUILTY

OR

___GUILTY OF THE LESSER OFFENSE OF —
HOMICIDE — MURDER SECOND DEGREE (EDWARD
BROWDER, JR.)

OR

___GUILTY OF THE LESSER OFFENSE OF —
INVOLUNTARY MANSLAUGHTER — FIREARM
INTENTIONALLY AIMED (EDWARD BROWDER, JR.)

COUNT 2 — WEAPONS—FELONY FIREARM
___GUILTY
___NOT GUILTY

> You can either—this is what this instruction is, either Not Guilty or Guilty or you can then consider the lesser offense of . . . Homicide Murder in the Second Degree, if you find the evidence supports that.

> If you don't find the evidence supports that and you want to consider the lesser offense, you may go on down to—you may consider the Involuntary Manslaughter, okay. That is—those are your options.

> You're only going to check one box. Okay.

-20-

* * *

This is the verdict form, ladies and gentlemen, that you're going to be getting.

The first box, under Count 1, Homicide Murder in the First Degree is Not Guilty.

If you find the evidence supports a finding of Not Guilty, you check that box, and then, that's it for Count 1. Got it?

If you don't, however, find that it supports that finding and you want to go—continue, you go down to the lesser offense of Second Degree Murder.

If you don't find the evidence supports that, you don't check that box.

Go down to the third—if you find that the evidence supports Involuntary Manslaughter, then so be it. If you don't, you don't check that box. It's very simple. Okay.

This Court, on appeal, held "that the verdict form was defective, requiring reversal, because it did not give the jury the opportunity to return a general verdict of not guilty." *Id*. at 468. The panel provided the following reasoning for its decision:

We note that the verdict form would not have been defective if it had included a box through which the jury could have found defendant not guilty of second-degree murder and not guilty of involuntary manslaughter. Despite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses such that his constitutional right to a trial by jury was violated. Accordingly, we reverse defendant's conviction and remand this case for a new trial. [*Id*.]

In reviewing this Court's reasoning in *Wade*, it is difficult to find any of its analysis that would not also apply to the case now before us other than the defendant in *Wade* was convicted of a lesser-included offense. Under the heading of "Count 1," both forms list "Not Guilty" first. That option does not contain any indication of what crime the person is being found not guilty. In *Wade*, the jury verdict form listed the charged crime in the same line as "Count 1," while in the instant case, the charged crime was listed next to the box for a guilty verdict. In both cases, after providing boxes for not guilty or guilty verdicts for the charged crime, the word "or" appears on its own line, before listing another potential guilty verdict, this time for the lesser included offense of second-degree murder. Neither jury verdict form contains an option for a "not guilty" verdict for second-degree murder. The form in *Wade* contains an extra option of guilty of involuntary manslaughter, but again does not indicate the possibility of a not guilty verdict for that lesser included offense. At the top of both forms, the directions indicate that there could be "only one verdict." While the words used are slightly different in each form, the meaning is identical. As this Court held in *Wade*, a reasonable juror could have believed that there was no option to find defendant not guilty of all charges. That juror would assume that

-21-

even if defendant was not guilty of first-degree felony murder, he must have been guilty of second-degree murder, because there was not a "not guilty" option next to that "guilty" section. See *id*.

In both cases, the trial courts undertook the task of explaining the jury verdict form to the jury before deliberations. The explanations were similar and detailed. Yet, this Court in *Wade* held that such attempts could not cure the constitutionally deficient form. Further, in reading both explanations, it appears as if the trial court in *Wade* was clearer than the trial court in the instant case. In *Wade*, the trial court told the jury not to check the box for second-degree murder or involuntary manslaughter if the evidence did not prove those crimes, and that the jury was to only check "one box." *Id*. at 465. The trial court in this case similarly instructed the jurors that they were to only check one box, but gave a rather opaque description regarding the possibility of a guilty verdict for second-degree murder, stating, "If you check that box, that would be a guilty. There's not a not guilty on that." The trial court did not explicitly tell the jurors that if they did not believe defendant was guilty of second-degree murder that they should not choose that option, nor were they told to go back and check the not guilty box in the first section. Consequently, the jury was left to assume that if it could not reach a decision regarding defendant's guilt or innocence of first-degree felony murder, it *had* to find defendant guilty of second-degree murder. This Court in *Wade* held that such an option was unconstitutional.

In sum, the forms were set up almost identically, the explanations of the forms also were almost identical, with the explanation in *Wade* being slightly clearer, and the challenge to those forms on appeal is the same. We are bound by the published decision in *Wade*, 283 Mich App at 465-466, wherein the panel held that such a form violated the defendant's "constitutional right to a trial by jury . . . ." The *Wade* Court was not persuaded that the error was nullified due to the trial court's explanation, noting that "[d]espite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses . . . ." *Id*. at 466. Likewise, the jury in the instant case was presented with an identical issue—there was no option for a general not guilty verdict or for a verdict of not guilty of second-degree murder. See *id*. Thus, we are bound by the precedent set in *Wade* to hold that the trial court's use of the verdict form was plain error. *Id*.

The prosecution attempts to avoid this conclusion by directing this Court to the Model Criminal Jury Instructions, contending that the model form that would have been applicable to the instant case is substantially similar to the one actually used. The relevant form, M Crim JI 3.26, provides the following:

**M Crim JI 3.26 Verdict Form**

Defendant: _____

[Count No. _____]

POSSIBLE VERDICTS:

You may return only one verdict on this charge. Mark only one verdict on this sheet.

_____ Not Guilty

_____ Guilty of _____

Guilty of the Lesser Offense of:

_____    _____

_____    _____

_____    _____

There are two pitfalls in the prosecution's argument. First, this Court is not bound by the Model Criminal Jury Instructions. See *People v Petrella*, 424 Mich 221, 277; 380 NW2d 11 (1985). Second, the jury verdict form used in the present case has minor, yet significant, differences from M Crim JI 3.26. The most significant difference is that the model form does not contain an "or" separating the charged crime and the lesser included offense. As discussed *infra* and in *Wade*, the use of "or" suggests that if the jury decides to move on from the charged crime, it must choose the guilty option for the lesser included offense. The trial court in the present case even said, "there is no not guilty for that." The absence of the "or" in the model form provides that there is only one crime, and the options are not guilty, guilty of first-degree murder, or guilty of second-degree murder. The form used in this case and in *Wade* suggested to the jury that there were two crimes and defendant was either guilty or not guilty of first-degree felony murder, or was guilty of second-degree murder. The difference, although just a minor linguistic variance, may have caused jury confusion and had the potential to be outcome determinative in the case before us. See *Wade*, 283 Mich App at 468. It is also of note that the model verdict form specifically identifies the remaining crimes as "lesser offenses." There was no such indication on the form in the instant case, suggesting again that the crimes were separate. In sum, regardless of the similarity to M Crim JI 3.26, this Court is bound by *Wade*, which

requires finding that the jury verdict form was plainly erroneous. See *Petrella*, 424 Mich at 277.[8]

Because the issue is unpreserved, this Court must consider whether the plain error affected defendant's substantial rights. *Carines*, 460 Mich at 763. As such, "[r]eversal is only warranted if defendant was actually innocent and the plain error caused defendant to be convicted or 'if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings," ' regardless of defendant's innocence." *Roscoe*, 303 Mich App at 648, quoting *Thomas*, 260 Mich App at 454, quoting *Ackerman*, 257 Mich App at 449. The facts surrounding the victim's murder are highly disputed, with there being significant exculpatory evidence. There were unknown DNA and fingerprints at the scene of the murder, some of which certainly did not belong to defendant and could not be attributed to any individual that normally would have been in the Hummer residence. Further, witnesses and cellular telephone evidence placed the defendant miles away from the ATMs that were being used with the victim's stolen debit card. While the jury was permitted to disbelieve that evidence or give it little weight, it is reasonably likely that the exculpatory evidence may have led to a not guilty verdict, had the jury believed that to be an option to second-degree murder. Instead, based on the effect of the form, which was strikingly similar to that in *Wade*, the jury was not given an option to find defendant not guilty of all crimes. Thus, as we are bound by *Wade*, we hold that defendant's substantial rights were affected by the plain error in the jury verdict form. *Roscoe*, 303 Mich App at 648.

The prosecution contends on appeal that the error was not outcome determinative because the jury chose to convict defendant of first-degree felony murder, rather than second-degree murder. The prosecution reasons that if the jury actually believed defendant was innocent but did not see an option to acquit him, it would have selected the lesser-included offense of second-degree murder. While this may seem facially persuasive, the argument fails. Facing an option of either second-degree or first-degree felony murder, the jury was required to find that defendant killed the victim. It is reasonable to assume that, once the jury was faced with the presumption that defendant was the victim's killer, the less disputed facts of the case required a finding of first-degree felony murder. After all, the facts of the crime show that the person who killed the victim committed larceny by taking personal items, clothing, cash, guns, and ammunition from the Hummer residence and using the victim's debit card to steal money from her account, which would underscore a predicate crime for a first-degree felony murder conviction. Thus, if the jury believed its purpose only was to determine whether defendant's killing of the victim was either first-degree felony or second-degree murder, the jury may have made its decision based on the largely undisputed allegation that the killer, whomever it was, committed a larceny during the commission of the murder. As defendant made an admission of larceny in his statement to police, the jury may have reasoned that if he killed the victim, defendant must have committed first-degree felony murder based on the options listed on the form. The assumption caused by the verdict form reflects the issue in this case. Did defendant commit murder? Because the jury's decision using the defective form may have compelled them to find defendant guilty of the

---

[8] We express no opinion whether the jury verdict form found at M Crim JI 3.26 would comply with the requirements announced in *Wade*, 283 Mich App at 468.

-24-

highest charged crime, the error was not harmless. It is as reasonably likely that had the jury been presented with a form allowing for a general verdict of not guilty, defendant would not have been convicted, or, perhaps, would have been convicted of second-degree murder. Therefore, given that the jury may have believed it was limited to choosing guilty or innocence relating only to first-degree felony murder, we must conclude the faulty jury verdict was a plain error affected defendant's substantial rights, requiring reversal and remand for a new trial. *Carines*, 460 Mich at 763.

Lastly, even if we were not convinced that the outcome of trial likely would have been different if a proper jury verdict form had been used, reversal is also warranted where an effective denial of defendant's right to a trial by jury "seriously affected the fairness, integrity, or public reputation of judicial proceedings, regardless of defendant's innocence." *Roscoe*, 303 Mich App at 648 (quotation marks omitted). In either case, there was plain error affecting defendant's substantial rights by virtue of the structure of the verdict form, and we must reverse. *Carines*, 460 Mich at 763.[9]

## V. CONCLUSION

Defendant also asserts that a new trial was warranted because defendant's interrogation video was played to the jury while containing evidence regarding a polygraph examination, four police officers testified regarding defendant's guilt and credibility, the prosecution committed misconduct during the questioning of those police officers and during closing arguments, and the jury's verdict was against the great weight of the evidence. Defendant also asserts that his sentence of life imprisonment without the possibility of parole was constitutionally infirm under the Cruel and/or Unusual Punishment Clauses of the Michigan and United States Constitutions. Given our conclusion that defendant must be provided a new trial, these issues have been rendered moot. Briefly, however, we have reviewed defendant's remaining issues on appeal and find that they are almost entirely without merit. However, we do note that the brief statement of Officer David Dwyre that it was his personal belief that defendant was guilty was in error. See *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). During any retrial, the prosecution

---

[9] Alternatively, because defendant has a preserved challenge to ineffective assistance of counsel based on defense counsel's failure to object to the jury verdict form, among other reasons, this Court's review would be required to consider the merits of defendant's claim that a change in the jury verdict form would have reasonably likely resulted in a different verdict. Briefly, the jury verdict form used at trial was constitutionally deficient, defense counsel should have objected to it, his failure to do so was objectively unreasonable, and had he made an objection it is reasonably likely that the outcome of trial would have been different. See *Wade*, 283 Mich App at 464-468; *Thomas*, 260 Mich App at 457; *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defense counsel even testified at the *Ginther* hearing that his failure to object was in error and that he now believes the jury verdict form was constitutionally deficient. Consequently, defendant was denied his constitutional right to the effective assistance of counsel, and this Court must reverse and remand for a new trial. *Strickland*, 466 US at 688, 694; *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012).

should exercise caution when questioning police about the ultimate issue of defendant's guilt. See *id*.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Peter D. O'Connell
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan